Filed 12/20/13  P. v. That CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C068530 |
| Plaintiff and Respondent, | (Super. Ct. No. SF107383A) |
| v. | |
| THA TATH, | |
| Defendant and Appellant. | |

A jury convicted defendant Tha Tath of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c);[1] count 1) and found that he personally used a firearm in the commission of the offense (§ 12022.53, subd. (b)).  It also convicted him of possession of a firearm by a convicted felon (former § 12021, subd. (a)(1), now § 29800, subd. (a)(1); count 2), but deadlocked on a count of possession of ammunition by a convicted felon (former § 12316, subd. (b)(1), now § 30305, subd. (a)(1); count 3).  The trial court found that defendant had suffered six prior convictions, each alleged as a serious felony (§ 667,

---

[1] Undesignated statutory references are to the Penal Code.

subd. (a)) and a strike (§§ 667, subds. (b)-(i), 1170.12).  Defendant was sentenced to state prison for 65 years to life, consisting of 25 years to life on count 1, 10 years for personal use of a firearm, 30 years for six prior serious felonies, and two years concurrent on count 2.  Count 3 was dismissed in the interest of justice.

On appeal, defendant contends (1) his robbery conviction is not supported by sufficient evidence of his identity as the perpetrator, and (2) his trial counsel rendered prejudicially ineffective assistance when he failed to present expert testimony on the issues of memory and eyewitness identification.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Case-in-Chief

**The Victims' Business**

Nacchatar Sidhu and his wife, Ruse Kaur, own two convenience stores in Stockton, one on Hammer Lane and the other on Thornton Road.  Their son, Warren,[2] helps out with the businesses.

Before the present robbery, defendant's wife, Senoun Tath, had been employed as a cashier at the Thornton Road store and had been present on occasions when Sidhu had handed Kaur money to be deposited at the bank.  Defendant's wife had worked at the Thornton Road store twice.  She was last employed there approximately one month before the robbery.

Sidhu was familiar with defendant because, on occasion, he purchased cigarettes at the Thornton Road store.  Sidhu said defendant smokes Marlboro brand.

Defendant had two cars.  One was a Chrysler.  Of the second car, Sidhu said, "they both look like the same, but different color."  Sidhu knew where defendant and his wife resided because he had transported defendant's wife home from work once.

---

[2] We refer to the son by his first name to avoid confusion with his father, whom we will refer to by his last name.

2

**The Robbery**

Kaur normally delivered the Hammer Lane store's deposits to the bank. However, on January 8, 2008, the day of the robbery, Warren delivered the deposits from both stores. He picked up the Thornton Road deposit and proceeded to Hammer Lane, arriving just before noon. After assisting his mother for a few minutes, Warren headed out of the store. He was carrying the bank deposits in a brown paper bag within a plastic bag, as was their usual practice. The Thornton Road deposit was $10,738; the Hammer Lane deposit was $8,455.

As Warren got into his car, a man approached him, put a gun to his head, mumbled something, and grabbed the bags containing the deposits from the front passenger seat of Warren's car where Warren had put them. Kaur came from inside the store and saw a man pointing a gun at Warren's head. She ran toward the man and he put the gun to her stomach, stating, "I'm gonna shoot you if you don't move." Kaur moved away, and the robber ran toward a nearby motel.

At trial in January 2011, Warren identified defendant as the person who had robbed him. Warren had never seen defendant prior to that day.

Warren testified that when he arrived at the Hammer Lane store, he saw the robber smoking a cigarette near the corner of the store. Before and during the robbery, the robber was wearing a red and gold San Francisco 49ers jacket, black jeans, and white tennis shoes. As the robber approached Warren's car, he flicked away a cigarette he had been smoking.

At trial, Kaur said she would not be able to recognize the robber. She indicated the robber had been wearing a hood and had his head down. She did not see his face.

Kaur testified that she had once met Senoun Tath's husband in a brief encounter at the Thornton Road store. She was in a hurry at the time. "[I]t was just a, hello, hi" and she left. Kaur did not remember him, and she believed the husband "was skinnier" than

3

defendant. When shown a photograph of defendant, she did not know whether the person was in the courtroom.

Kaur testified that she nonetheless recognized the robber as a person she had chased away from the building the previous day approximately the same time as the robbery. He had been wearing the same 49ers jacket, and he had been sitting at the corner of the building reading a newspaper, which Kaur found to be very strange. This was the time Kaur normally left the store with the bank deposits. However, on the day before the robbery, Kaur had been awaiting an inspection and she did not take the deposit until later in the day.

In February 2009, during earlier proceedings at which defendant was present, Warren had been asked whether the robber was in the courtroom, and he had replied that he was "not sure." At trial, Warren noted that he had been "really nervous" during the prior proceeding and that defendant had not had a mustache at that time. Warren testified at trial that he had no doubt defendant was the robber.

**The Investigation and DNA Results**

Following the robbery, a Stockton police officer arrived at the Hammer Lane store and contacted Warren, who described the robber as an Asian or Hispanic male in his 20's, six feet tall, 150 or 160 pounds, with a goatee, wearing a red and gold San Francisco 49ers jacket with a hood, and dark baggy pants. Warren indicated that the robber was armed with a black semiautomatic handgun. Based on her encounter the previous day, Kaur said the robber was Asian. She testified that the reason she had not gotten a good look at the robber was probably because the robber was shorter than her. She is five feet six inches tall.

Based on Warren's statement about the robber discarding a cigarette just before the robbery, the officer looked for and found a partially smoked cigarette butt on the ground outside the driver's window of Warren's car. It was the only cigarette butt

4

located on that side of the car. Four partially smoked cigarettes were recovered from the southeast corner of the business.

The cigarette butt found near Warren's car, and one of the four cigarette butts found near the building, were Marlboro brand. The cigarette butts were wet because it had been raining. A crime scene technician collected the cigarette butts and placed each one in a manila envelope where they were all air dried.

The police recovered a video of the robbery from two security cameras located outside the store, which was shown to the jury.

Additional video was recovered from an external security camera at the nearby motel. It showed the driver stepping from a dark-colored Chrysler 300 and walking toward the store. A short time later, the driver ran back to the car and drove away. Video for the previous day taken from the motel camera showed the same car arriving at the motel parking lot at 11:33 a.m. The driver left the car and walked toward the store. At 1:06 p.m., a person returned to the car and drove away. The motel videos were shown to the jury.

Sidhu viewed the video from the motel and observed that the car looked like defendant's Chrysler. About a week after the robbery, Sidhu drove by the Tath residence and saw the Chrysler. Kaur also drove by the Tath residence and saw a green car similar to the one in a picture that detectives had shown her.

Five days after the robbery, Sidhu and Kaur informed police that they suspected the robbery had been committed by the husband of a former employee and named the street where they resided. A police officer drove by the Tath residence and saw a Chrysler 300, similar to the car in the surveillance video. The car was registered to the Taths.

Stockton Police Detective Michael Perez assembled a photographic lineup that included a Department of Motor Vehicles photograph of defendant taken in March 2006. In February 2009, Warren and Kaur were separately shown the lineup. Warren selected

5

defendant, the person in position two. Warren told police something like, "That's the guy. That looks like him." Kaur pointed out one man because of his mustache. She could see the robber's mustache when he had his head down, but not his whole face.

DNA testing was conducted on the five cigarette butts recovered from the crime scene. The two Marlboro butts had the same DNA profile as defendant. Based on the unlikelihood of a random match, the criminalist opined that the matching profiles were "strong evidence" that the DNA on the cigarette butts had come from defendant.

Police conducted a traffic stop of defendant on February 20, 2008. After defendant was taken into custody defendant's wife arrived at the scene of the traffic stop in the Chrysler.

After defendant's arrest, the police searched his residence. In the master bedroom closet, officers found a hooded, red and gold San Francisco 49ers team jacket and a windbreaker with a .25-caliber automatic pistol in the pocket. In a nightstand, officers found mail addressed to defendant at the subject residence, as well as .45-caliber bullets and a single .32-caliber bullet.

Warren testified that the 49ers jacket and pistol recovered by the police were the ones used by the robber. Kaur testified that the pistol was "[p]retty close" to the one used in the robbery.

At the time of his arrest, defendant was 39 years old. He was five feet eight inches tall and weighed 145 pounds.

### Defense Case

Defendant's daughter attended the Head Start program at Oakwood School. A former preschool teacher testified that when a person brings a child to the school, the person must sign in the child and write down the date and time. Similarly, when a child is picked up from the school, the person must sign out the child. The sign-in sheet was on a desk at the front door.

On January 8, 2008, the day of the robbery, there was a parent orientation. Parents were required to remain with their children during orientation because the school was not equipped to supervise children while orienting parents. Thus, if a parent was unable to attend the orientation, he or she could not leave the child at school that day.

A former assistant teacher at the Head Start program testified that at Oakwood School, a health check was conducted on children before they were signed in. When children were checked out, teachers ensured that an authorized person was picking them up.

Defendant's niece attended the same school as his daughter, and the two of them usually came to and left the school together.

The teacher testified that on January 8, 2008, defendant dropped off his daughter and niece at school around 11:30 a.m. Defendant was asked to retrieve the children because they could not be at the school that day without a parent. Defendant returned for the children and signed them out shortly after noon.

Senoun Tath, the wife of defendant, testified that she last worked for the victims in April 2007. While she was employed there, defendant usually took her to work and picked her up after work. He also brought her lunches.

Senoun testified that the jackets seized by the police did not belong to defendant. Furthermore, the bullets found in the nightstand belonged to her ex-husband, who had given her the nightstand. She had not seen the pistol before, and she does not allow guns in her house.

Senoun testified that on January 8, 2008, she and defendant dropped off their daughter at school, and defendant signed her in. As they were driving to another destination, they received a call saying they needed to return to the school. Once at the school, defendant retrieved his daughter and the niece. They took the niece to Senoun's mother's home and then went to lunch at the godmother's home, where they stayed until 2:45 p.m.

7

At the time of defendant's arrest, Senoun and her 17-year-old son were in the Chrysler en route to a medical appointment. They observed defendant's car and stopped. At that time, her son was six feet tall and weighed approximately 170 pounds.

## DISCUSSION

### I. Insufficient Evidence Claim

Defendant contends his robbery conviction is not supported by sufficient evidence of his identity as the perpetrator. We disagree.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480 (*Boyer*).)

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) " ' " 'To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' " (*People v. Friend* (2009) 47 Cal.4th 1, 41 (*Friend*), quoting *People v. Barnes* (1986) 42 Cal.3d 284, 306.)

Defendant contends Warren's testimony identifying him as the robber was "inherently improbable." He relies on the following: Warren's limited time to observe the perpetrator, the perpetrator's features being partially obscured, Warren's focus on the perpetrator's weapon, Warren's not having seen the perpetrator previously, Warren's

8

initial description being inconsistent with defendant's features, Warren's less than positive identification of defendant from a photographic lineup, Warren's failure to identify defendant at an earlier court appearance, and Kaur's failure to identify defendant even though she had been acquainted with him.

Whether viewed singly or in combination, these factors do not show that defendant's perpetration of the offense was *physically impossible or inherently improbable*. Thus, there was substantial evidence of defendant's identity based solely on Warren's testimony.

Moreover, there was significant circumstantial evidence linking defendant to the robbery. Defendant's wife worked for the family and had seen deposits being picked up at the Thornton Road store. Defendant claims there was no evidence that his wife's employment at the Thornton Road store had imparted any knowledge of the cash handling procedures at the Hammer Lane store. He argues that, had he relied on her knowledge, he would have robbed the Thornton Road store where she had worked rather than the Hammer Lane store. As with the claims related to Warren's identification, these claims fail because they do not show physical impossibility. (*Friend, supra*, 47 Cal.4th at p. 41.) Furthermore, because the robber stole only otherwise innocuous bags after apparently lying in wait and did not demand Warren's wallet or other property, there is a strong inference that the robber was someone familiar with the family practice of carrying the deposits in such bags. And it seems less likely defendant would have robbed the Thornton Road store, because he was known there; he had visited that store occasionally and even purchased cigarettes from Sidhu, but had only met Kaur in passing.

Defendant discounts the DNA evidence. He contends the DNA samples on both Marlboro cigarettes were degraded and the criminalist testified that one of many reasons for this could have been age. Yet, the criminalist testified that degradation was not a factor in this case. Defendant also claims the butts may have been discarded by

9

defendant "some time before the robbery," perhaps "days before." The claim of coincidence is unavailing. That a butt with defendant's DNA profile was found near where Warren saw the robber smoking before the robbery and another butt with defendant's DNA profile was found in the area where Warren saw the robber discard a cigarette is circumstantial evidence that, when added to the other circumstantial evidence and the eyewitness identification evidence, further supports the conviction.

Finally, defendant claims we must "consider that [he] presented a credible and uncontradicted alibi." However, a jury's verdict reflecting the rejection of an alibi will not be upset where substantial evidence contradicts the alibi evidence. (*People v. Ash* (1948) 88 Cal.App.2d 819, 826.)

In denying defendant's new trial motion based on insufficiency of the evidence, the trial court stated: "The evidence which was provided at trial by the prosecution included not only eyewitness identification, but DNA evidence, a video of the perpetrator driving away in a car found at the defendant's residence later, clothing and a gun matching the one[] used by the robber found in a closet adjacent to the bedroom of the defendant. Either this has to be some of the more overwhelming evidence of defendant's guilt I've seen or one of the most stunning series of coincidences I've ever seen in a courtroom."

The trial court's careful summary and evaluation of the evidence finds ample support in the record. Defendant's robbery conviction is supported by substantial evidence. (*Boyer*, *supra*, 38 Cal.4th at pp. 479-480.)

## II. Ineffective Assistance of Counsel Claim

Defendant contends his trial counsel rendered ineffective assistance when he failed to present expert testimony on the issues of memory and eyewitness identification. In a separate argument, he claims counsel's failure was prejudicial because the case was close in that the jury was required to decide between "convincing evidence of alibi and evidence of [defendant's] DNA at the scene." We are not persuaded.

10

A conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) ___ U.S. ___, ___ [178 L.Ed.2d 624, 642 (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284].)

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' " "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." (*Richter*, *supra*, ___ U.S. at p. ___ [178 L.Ed.2d at p. 642].) "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." (*Richter*, *supra*, ___ U.S. at p. ___ [178 L.Ed.2d at p. 643].) This wide latitude applies to the decision to use expert witnesses. (*Ibid.*)

Moreover, " ' "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).)

In this case, defendant's trial counsel was not asked to explain why he did not present expert testimony on memory and eyewitness identification. Moreover, there could have been a satisfactory explanation.

As noted, when it denied defendant's new trial motion, the trial court opined that the evidence of guilt was overwhelming.  The court specifically pointed out that, in addition to the evidence of eyewitness identification, there was DNA evidence, a video of the perpetrator driving away in a car later found at defendant's residence, and clothing and a gun in a closet adjacent to defendant's bedroom that matched the clothing and gun used by the robber.

Defendant's trial counsel rationally could have perceived that, because the eyewitness identification was corroborated by abundant evidence, there was very little chance that expert testimony on memory and identification could benefit the defense. Thus, the claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding.  (*Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.)

### DISPOSITION

The judgment is affirmed.


                                                                                   MURRAY      , J.


We concur:


               ROBIE            , Acting P. J.


               BUTZ            , J.